United States Court of Appeals

Fifth Circuit

**F I L E D**

August 23, 2005

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

m 04-11078

RICHARD BELL,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED; ET AL.,

Plaintiffs,

PLUTARCH, LTD., MARIO SONZONE,

Plaintiffs-Appellants,

VERSUS

ASCENDANT SOLUTIONS, INC.; NORMAN CHARNEY;
PAUL JENNINGS; CCLP, LTD., ALAN E. SALZMAN,

Defendants-Appellees.

\* \* \* \* \* \* \* \* \* \* \* \* \*

DENNIS HOFFMAN,
INDIVIDUALLY AND ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED; ET AL.,

Plaintiffs,

PLUTARCH, LTD.,

Plaintiff-Appellant,

VERSUS

ASCENDANT SOLUTIONS, INC.;
NORMAN CHARNEY; PAUL JENNINGS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before GARWOOD, SMITH, and CLEMENT,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Mario Sonzone and Plutarch, Ltd., an individual investor and a closely-held Liberian corporation, appeal the denial of class certification in a securities fraud suit against Ascendant Solutions, Inc. ("Ascendant"), some of its former executives and directors, and a related entity. Concluding that the district court did not abuse its discretion, we affirm and remand.

I.

Ascendant, a Dallas-based firm founded in 1995, provided electronic order management and customer service solutions to e-commerce and direct marketing firms. It made an initial public offering ("IPO") of five million shares of common stock on November 11, 1999. All the shares were purchased on a firm-commitment basis and at a pre-set price ($8.00 per share) by an underwriting syndicate. After

two days of trading on the NASDAQ National Market, both of which were marked by insignificant price declines, Ascendant common stock more than tripled in price within three weeks, closing at $28.00 on November 30, all during the twenty-five-day post-IPO "quiet period." *See* 17 C.F.R. § 230.174(d).

The good times were short-lived: On January 24, 2000, Ascendant announced that problems with its capacity to provide the requisite software services had caused it to lose three of its seven customers, including one featured in Ascendant's prospectus as a "Select Client Case Stud[y]." The next day, Ascendant's stock price declined almost 30%. By the end of September, it had announced that it would no longer provide order fulfillment and customer-service call-center operations; by May 2001, it had been de-listed from NASDAQ.

## II.

Litigation ensued. The district court consolidated five securities fraud class action complaints filed against Ascendant and some of its executives and directors and appointed lead plaintiffs. Plaintiffs filed an amended class action complaint; a motion to dismiss followed, which the district court granted in part and denied in part, winnowing-down some of the plaintiffs' allegations but leaving their basic theory of liability intact: Ascendant and various insiders had made false and misleading statements in connection with the IPO regarding the scope of Ascendant's order management and customer service systems and its success in providing such systems to clients.

Plaintiffs then moved to certify a class, based on Federal Rule of Civil Procedure 23(b)(3), consisting of all persons (except defendants and certain related persons and inter-ests) who purchased Ascendant common stock on the open market between November 11, 1999 (the date of the IPO) and January 24, 2000 (the day Ascendant announced its troubles) and who were damaged by defendants' allegedly false and misleading statements in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and rule 10b-5 promulgated thereunder.[1]

Ascendant responded in opposition to class certification and, in support, submitted an expert report, the rub of which was that Ascendant's common stock did not trade in an efficient market. This being so, Ascendant maintained, the putative class could not invoke the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and obtain the benefit of its class-wide presumption of reliance,[2] leaving plaintiffs' fraud claims

---

[1] *See* 15 U.S.C. § 78j(b), 78t(a); 17 C.F.R. § 240.10b-5.

[2] The fraud-on-the-market theory enables investors who cannot satisfy the traditional requirement of proving actual reliance on a fraudulent representation (*i.e.*, those investors who did not read the documents or hear the statements alleged to contain the fraudulent representations) nevertheless to maintain a fraud action for which reliance is an essential element. It does so by "interpreting the reliance requirement to mean reliance on the integrity of the market price rather than reliance on the challenged disclosure." Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 CORNELL L. REV. 907, 908 (1989).

The central premise of the theory is that, in an efficient capital market, the market price of a stock reflects all public information; hence an investor who purchases a stock in such a market is harmed if the price reflects false information as a conse-
(continued...)

dependent on proving individual reliance and thus unsuited for aggregation.[3]

Plaintiffs responded with an expert report of their own, which included an event study purporting to show that Ascendant common stock did, in fact, trade in an efficient market. But the district court, on Ascendant's motion to exclude under *Daubert*,[4] excluded plaintiffs' expert, concluding that his event study was unreliable and purposefully designed to support its market-efficiency conclusion.

The court then determined that plaintiffs, lacking an expert, had otherwise failed to demonstrate that Ascendant common stock traded in an efficient market, so the putative class could not take advantage of the presumption of class-wide reliance permitted under the fraud-on-the-market theory. The fraud claims thus would require proof of individual reliance, so the proposed class does not satisfy the predominance requirement of rule 23(b)(3). Accordingly, the court denied class certifica-

tion.[5] Plaintiffs thereafter sought, and we granted, pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, an interlocutory appeal of that denial.

### III.

The class certification decision rests within the sound discretion of the district court, so long as that discretion is exercised within the framework of rule 23. *See Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004); *Castano*, 84 F.3d at 740. Thus we review for abuse of discretion the denial of class certification. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir.), *cert. denied*, 125 S. Ct. 277 (2004).

### IV.

Plaintiffs challenge the district court's conclusion that they failed adequately to show that Ascendant common stock traded in an efficient market during the class period. We understand their argument on appeal to contain two primary contentions. First, they claim they need only plead market efficiency at the class certification stage and that the district court, by looking beyond the pleadings, improperly decided an issue going to the merits under *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). Second, they attack the substance of the court's market efficiency determination on the ground that the court failed to give due consideration to various factors relevant to market efficiency.

### A.

Plaintiffs claim they are required only to plead market efficiency at the class certification stage and that the district court, by going

---

[2] (...continued) quence of a material misrepresentation. *See id.* at 911; *Basic,* 485 U.S. at 246. Accordingly, the fraud-on-the-market theory holds "only to the extent that markets efficiently reflect (and thus convey to investors the economic equivalent of) all public information". *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 731-32 (7th Cir. 2004), *cert. denied*, 125 S. Ct. 1639 (2005).

[3] *Cf. Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue.").

[4] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[5] *See Bell v. Ascendant Solutions, Inc.*, No. Civ. A. 3-01-CV-0166-N, 2004 WL 1490009 (N.D. Tex. July 1, 2004).

beyond the pleadings and requiring a threshold showing, improperly decided an issue going to the merits under *Eisen*. This betrays a misreading of *Eisen*, which, as we explained in *Castano*, does not suggest that a court is limited to the pleadings when deciding on class certification. Rather, *Eisen* "stand[s] for the unremarkable proposition that the strength of a plaintiff's claim should not affect the certification decision." *Castano*, 84 F.3d at 744.[6]

*Eisen* therefore offers no support for the view that a district court must accept, on nothing more than pleadings, allegations of elements central to the propriety of class certification under rule 23.[7] As the Fourth Circuit

has cogently explained in rejecting a similar contention,

> *Eisen*'s prohibition against assessing plaintiffs' likelihood of success on the merits as part of a Rule 23 certification does not mean that consideration of facts necessary to a Rule 23 determination is foreclosed merely because they are required to be proved as part of the merits. The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental. The findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of Rule 23 have been demonstrated.

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004). Thus, in the market efficiency context, "[a]lthough the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder, the court may not merely presume the facts in favor of an efficient market." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 (5th Cir. 2005).[8]

---

[6] *See Castano*, 84 F.3d at 744. ("In *Eisen*, the Court held that it was improper to make a preliminary inquiry into the merits of a case, determine that the plaintiff was likely to succeed, and consequently shift the cost of providing notice to the defendant.") (citing *Eisen*, 417 U.S. at 177)).

[7] *Cf. Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982) ("[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (reasoning that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"); *Castano*, 84 F.3d at 744 ("A district court may certainly look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.") (footnote omitted)); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to (continued...)

[7](...continued) certify a class cannot be found in Rule 23 and has nothing to recommend it. . . . Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23. . . . And if some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits.").

[8] *Cf. Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 414 (5th Cir. 2001) ("*Basic* plainly states that (continued...)

Indeed, the suggestion that a court must accept mere allegations of market efficiency is demonstrably at odds with *Unger* and, more fundamentally, with a district court's duty, rooted in the text of rule 23(b)(3), to "find[]" that common issues predominate before certifying a class.[9] At issue in *Unger* were "the standards and procedures used by district courts when considering certification of securities class actions dependent on the 'fraud on the market' theory," and we held that "a careful certification inquiry is required and findings must be made based on adequate admissible evidence to justify class certification." *Unger*, 401 F.3d at 319.

In so doing, we stressed the critical link between a threshold showing of market efficiency and a district court's duty to ensure that class members' fraud claims are not predicated on proving individual reliance:

Without an initial demonstration of market efficiency, there is no assurance that the available material information concerning the stock translates into an effect on the market price and supports a classwide presumption of reliance. Absent an efficient market, individual reliance by each plaintiff must be proven, and the proposed class will fail the predominance requirement.

*Id.* at 322. Accordingly, we joined several of our sister circuits in applying "rigorous, though preliminary, standards of proof to the market efficiency determination," *id.*, and we set forth various factors utilized by courts to decide whether a stock trades in an efficient market.[10]

Plaintiffs acknowledged *Unger* at oral argument but contended it is irrelevant insofar as it involved a small-cap stock traded on the over-the-counter market, whereas Ascendant was listed on the NASDAQ National Market and traded more heavily. *Unger* did involve a small-cap stock traded on a less-developed

---

[8](...continued) the presumption of reliance [under the fraud-on-the-market theory] may be rebutted by '[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff.'") (quoting *Basic*, 485 U.S. at 247)).

[9] *See Unger*, 401 F.3d at 321 ("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."); *Gariety*, 368 F.3d at 365 ("If it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for . . . making 'findings' that the requirements of Rule 23 have been satisfied.") (citing FED. R. CIV. P. 23(b)(3)) (internal citations omitted).

[10] These factors include (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock. *Unger*, 401 F.3d at 323 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, at 1286-87 (D.N.J. 1989)); *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

market, and these distinctions are, of course, relevant to the substance of the market efficiency determination. But we reject the suggestion that *Unger* exempts plaintiffs in suits involving stocks traded on larger securities markets from the burden of making a preliminary showing of market efficiency at the class certification stage.

Beyond the conflict with rule 23(b)(3)'s requirement that a court "find[]" that common issues predominate and the forceful logic of *Unger* itself,[11] as well as the obvious problems that would attend application of such a rule (*e.g.*, which markets and how much volume (and for how long) would suffice to free a putative class from the threshold proof requirement?), we note that, as explained further *infra*, the mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient. *See Cammer*, 711 F. Supp. at 1281. In fact, "some companies listed on national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements. While the location of where a stock trades might be relevant, it is not dispositive of whether the 'current price reflects all available information,'" *id.* (footnote omitted), which, of course, is the hallmark of

an efficient capital market.[12]

In any event, if plaintiffs are as confident as they seem to be in their empirical assertion that the market for stocks, such as Ascendant, listed on NASDAQ are necessarily efficient during the relevant class periods, then making a preliminary showing of such efficiency on competent, admissible evidence should be no burden at all. Accordingly, we reject plaintiffs' contention that the district court erred in going beyond the pleadings and requiring them to do more than just allege market efficiency to satisfy the predominance requirement of rule 23(b)(3).[13]

---

[12] *See, e.g.*, Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 STAN. L. REV. 1059, 1060 (1990).

[13] Plaintiffs also claim that the district court improperly required expert testimony to prove market efficiency. But plaintiffs fail to grasp the distinction between saying something *has not been proven* without an admissible expert report and saying something *cannot be proven* without it. The district court did not hold, as plaintiffs' briefing suggests, that expert testimony is required as a matter of law to show market efficiency. Rather, the court found the particular expert testimony offered by plaintiffs to be unreliable, then concluded that there was otherwise insufficient evidence of market efficiency to permit plaintiffs to demonstrate predominance by way of the fraud-on-the-market theory.

In any case, although "[t]here is no requirement for expert testimony on the issue of market efficiency . . . many courts have considered it when addressing this determination, which may often benefit from statistical, economic, and mathematical analysis." *Unger*, 401 F.3d at 323 n.6. Indeed, though *Unger* admonishes district courts "not to
(continued...)

---

[11] *See Unger*, 401 F.3d at 325 ("Questions of market efficiency cannot be treated differently from other preliminary certification issues."); *id.* at 323 ("[T[he court may not simply presume the facts in favor of an efficient market."); *id.* at 325 ("When a court considers class certification based on the fraud on the market theory, it must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence.").

### B.

Thus, our focus narrows to the substance of their market efficiency showing; we consider whether the court abused its discretion in finding that plaintiffs failed to make a showing sufficient to avail themselves of the class-wide presumption of reliance under the fraud-on-the-market theory. Because we hear this appeal on an interlocutory basis, however, our review is bridled by rule 23(f). Under that rule, "a party may appeal only the issue of class certification; no other issues may be raised." *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).[14] Consequently, as plaintiffs concede, we may not review the exclusion of their expert report, so we must look to the remainder of their market efficiency showing and determine whether the district court abused its discretion in finding it wanting. We see no abuse of discretion.

Plaintiffs argue the district court failed to give due consideration to various factors of market efficiency: (1) Ascendant's listing on NASDAQ; (2) trading volume; (3) the number of market makers and analysts; and (4) stock price movement in response to new, company-specific information. Beyond their expert report, however, plaintiffs did not provide the court with any analysis of these or other market efficiency factors.

Plaintiffs' motion for class certification is devoid of any arguments or evidence in support of the fraud-on-the-market theory. The brief filed in support of the motion does contain a section on predominance, but it, too, contains no analysis of any of the market efficiency factors. Instead it merely assumes that the putative class is entitled, as a matter of right, to a presumption of reliance, noting with little more than a citation to *Basic* that "the reliance element is presumed."

To be sure, plaintiffs did emphasize to the court that Ascendant was traded on a major stock exchange, but the court was well within reason to find this fact alone insufficient to show market efficiency and thus predominance. After all, the relevant question is whether the market for a particular security is efficient, because a market can be open and developed for some securities and not for others. As the court in *Cammer* explained, "[i]t would be illogical to apply a presumption of reliance merely because a security is traded within a certain whole market without considering the trading characteristics of the individual stock itself." *Cammer*, 711 F. Supp. at 1281 (internal marks omitted).[15]

As for trading volume, plaintiffs' brief in support of class certification did note, in its statement of facts, Ascendant's high average

---

[13](...continued) insist upon a 'battle of the experts' at the class certification stage," *id.*, we quoted with approval a statement from the district court's opinion in this case in defense of considering at least the reliability of expert testimony on market efficiency at the class certification stage. *Id.* at 323-24 n.6 (citing *Bell*, 2004 WL 1490009, at *3-*4).

[14] *Bertulli*, of course, recognizes an exception to this rule, but only for challenges to the power of federal courts to entertain the underlying action in the first instance: "Standing is an inherent prerequisite to the class certification inquiry; thus, despite the limited nature of a Rule 23(f) appeal, defendants can raise the issue of standing before this court." *Id.*

[15] *See also id.* ("[T]he inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.").

8

trading volume. But the relevant indicator is turnover measured as a percentage of outstanding shares, *see id.* at 1286, and plaintiffs provided the court with no analysis of this figure. And their effort is no better on appeal, for they merely repeat the same number without reference to the total number of outstanding shares.

Nor did plaintiffs' briefing to the district court discuss the presence of market makers for Ascendant stock. They contend on appeal, however, that the presence of between seventeen and twenty-three market makers during the class period supports a finding of market efficiency. Yet, even if we were to consider this factor on appeal, both the caselaw and economic literature suggest "the mere number of market makers, without further analysis, has little to do with market efficiency." *Unger*, 401 F.3d at 324.[16]

Instead the relevant information, which plaintiffs did not provide, concerns "the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so." *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996). Similarly, plaintiffs did not discuss analyst coverage in their motion or brief to the district court. They do cite on appeal to the expert reports submitted in the district court, both of which discuss analyst coverage, but even if this factor was properly raised in the district court, it reveals that Ascendant did not have analyst coverage for more than a third of the class

period.[17]

Finally, as far as price movement in response to new, company-specific information is concerned, plaintiffs addressed this issue in a sustained way only in the event study prepared by their expert. Yet the district court excluded this evidence as methodologically unsound and thus unreliable after concluding that, once a single day on which no company-specific information was released was excluded from the sample, there was no statistically significant difference between stock-price movement on so-called information days and non-information days. And though plaintiffs stress the single-day price decline on the last day of the class period in response to what they deem a corrective disclosure, this single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period, especially here where the class period begins as early as the day of the IPO itself.[18]

---

[17] We also note that three of the four analysts who eventually covered the stock and made purchase recommendations were underwriters of the IPO. *Cf.* William O. Fisher, *Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?* 54 EMORY L.J. 843, 972 (2005) (suggesting that increasing numbers of sell-side analysts for stocks, such as Ascendant, that rose and fell during the Internet bubble should not be regarded as corresponding to an increase in probability of an efficient market in such stocks, because analysts were "behaviorally biased" and likely "contributed to market inefficiency by statistically biasing price changes").

[18] *See Gariety*, 368 F.3d at 368 (finding at class certification stage that although drop in price after revelation of company's insolvency does reflect "the assimilation of market information at its

(continued...)

---

[16] *See also* Brad M. Barber et al., *The Fraud-on-the-Market Theory and Indicators of Common Stock's Efficiency*, 19 J. CORP. L. 285, 307 (1994) (finding that "the number of market makers [does] not marginally contribute to distinguishing between efficient and inefficient firms").

## V.

In sum, even if competent evidence could be marshaled to make a plausible case that Ascendant common stock traded in an efficient market such that reliance should be presumed for the class, this case comes to us with plaintiffs' expert report excluded and their briefing to the district court devoid of any serious effort to show market efficiency, so plaintiffs have not made that case. Accordingly, because it is their burden to demonstrate that common issues predominate,[19] we find no abuse of discretion in denying class certification. Nor are we persuaded that we should require that they get a second bite at the class certification apple; inadequate briefing on an issue critical to class certification for which a party bears the burden of proof is no basis for us to order a repêchage round.

The order denying class certification is AFFIRMED, and this matter is REMANDED for further proceedings.

---

[18](...continued) grossest level, that single piece of information, standing alone, does not represent adequate evidence that plaintiffs . . . purchased their shares . . . in an efficient market").

[19] *See O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003) ("The party seeking certification bears the burden of demonstrating that the requirements of rule 23 have been met."); *Castano*, 84 F.3d at 740 ("The party seeking certification bears the burden of proof.").